## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

RAIL TRANSFER, INCORPORATED, a
Minnesota corporation, individually, and on
behalf of all others similarly situated,

        Plaintiff,

v.

SYNGENTA CORPORATION;
SYNGENTA CROP PROTECTION, LLC;
and, SYNGENTA SEEDS, INC.,

        Defendants.

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

      Plaintiff Rail Transfer, Incorporated ("Plaintiff"), through its undersigned attorneys, brings this action individually and on behalf of all others similarly situated against Defendants Syngenta Corporation, Syngenta Crop Protection, LLC, and Syngenta Seeds, Inc., (collectively "Defendants" or "Syngenta") and allege as follows:

## I.    NATURE OF THE CASE

      1.    This class action is brought by Plaintiff challenging the conduct of Syngenta, which has caused significant damage and financial loss to Plaintiff and the Class of similarly situated grain exporters and related entities throughout the United States, through its contamination of U.S. corn and DDGS supply, making it unfit for export to China, a major trade partner and importer of corn and DDGS, depressing the price of corn and DDGS in the United States.

2.     DDGS stands for "distiller's dried grains with solubles."  DDGS are the nutrient (high in protein) co-products of corn-based ethanol production.  DDGS are utilized as energy and protein supplements.  U.S. ethanol plants produce approximately 30 million tons of DDGS a year, with more than 9 million tons being exported each year. China imports the bulk of DDGS – approximately 34.2% of U.S. exports.  Traditional U.S. corn importers import much less, with Canada importing only 6% of U.S. exports and Japan importing only 5%.  Thus, China is a significant and major trade partner for DDGS and corn exports.

3.     Plaintiff provides loading and other logistical services to exporters of DDGS to Chinese importers.   Plaintiff is capable of loading 2,000 metric tons of DDGS into containers each day.  Once the 40-foot containers are loaded, they are transported by rail to the Pacific Northwest where they are then loaded on cargo ships bound for China.

4.     Syngenta is a major agribusiness company with its principal place of business in Minnetonka, Minnesota.   Among other things, Syngenta is involved in the commercial seed business, developing, producing, and selling, through dealers and distributors or directly to growers, a wide range of agricultural products throughout the United States, including corn seed with certain genetically modified traits. After development, Syngenta then licenses corn seed with multiple genetically enhanced features, called "trait stacks," to seed manufacturers, including Syngenta subsidiaries.

5.     This case challenges Syngenta's conduct with regard to MIR162, used in the Agrisure VIPTERA™ and Agrisure DURACADE™ trait stacks. Agrisure DURACADE™ is Syngenta's second generation of MIR162 corn and was released, sold

and distributed for planting in 2014. Over seventy (70) varieties of corn use the MIR162 trait to produce a protein that results in insect resistance. These corn varieties are commonly referred to as VIPTERA corn and DURACADE corn, representing the particular traits the corn will express.

6.      Beginning in 2010, Syngenta released a genetically modified corn trait known as MIR162, sold under the Agrisure VIPTERA™ ("VIPTERA") trademark, into the U.S. market.  While MIR162 was intended to control insect damage, Syngenta's actions caused the contamination of the entire U.S. corn and DDGS supply as MIR162 is prohibited from export to countries such as China where it has not been approved for purchase or consumption. Syngenta knew this, yet still marketed and sold VIPTERA containing MIR162. Such conduct was reckless, deceptive, and unlawful and caused financial loss to the Class as among other things, it caused a depression in corn and DDGS prices.

7.      A substantial amount of the total U.S. corn crop, including Minnesota's corn production, is exported.  In fact, over half of the corn grown in the United States is exported throughout the world market. U.S. exports of corn and DDGS amount to billions of dollars annually.  China is a major destination of U.S. corn and DDGS exports, whose importance, until the trade disruption outlined herein, was projected to grow significantly over the next ten years.

8.      The U.S. corn marketing system is commodity-based, meaning the corn grown by farmers is harvested, gathered, commingled, consolidated, and otherwise shipped from thousands of farms from which it is cultivated, harvested and passed

through local, regional, and terminal distribution centers.  In order to maintain the stability of the corn marketing system and its integrity, it is essential that the U.S. corn supply and U.S. corn and DDGS exports maintain the highest standards of purity and integrity and be free from contaminating features that can cause export shipments to be rejected by trade partners.

9.     Prior to the incidents giving rise to this lawsuit, the U.S. corn and DDGS market maintained a reputation for such purity and integrity. Now, due to Syngenta's premature release of Agrisure VIPTERA corn ("VIPTERA corn"), sale of U.S. corn to China has decreased significantly and corn and DDGS prices have decreased.

10.     Due to Syngenta's conduct described and complained of herein, Plaintiff and those similarly situated in the Class have incurred losses, damage and injury arising from the rejection of U.S. grown corn and DDGS by export markets.  They have sustained damage to their business operations.  In addition, because the substantial portion of the U.S. corn crop and DDGS is exported annually, the United States' ability and limitations of corn and DDGS exports deeply impacts corn and DDGS price levels. Due to Syngenta's release of Agrisure VIPTERA, Plaintiff and those in the Class have incurred, and will continue to incur, substantial losses arising from the loss of export markets and price depressions, in amounts that have yet to be fully determined, but which exceed $5,000,000.

11.     Plaintiff and the members of the Class have been damaged, at least, by: (1) Syngenta's premature release of VIPTERA corn into the U.S. corn and corn seed supply which has reduced and/or prevented the export of U.S. corn and DDGS to China and

caused a depression of corn and DDGS prices; (2) Syngenta's premature release of DURACADE corn into the U.S. corn and corn seed supply which, again, has effectively foreclosed U.S. exports of corn and DDGS to China; (3) Syngenta's materially misleading failure to disclose material facts that MIR162 was not approved in China; (4) Syngenta's premature release of VIPTERA and DURACADE corn into the U.S. corn and corn seed supply resulting in the commingling of MIR162-corn with Plaintiff and the Class's non-MI162 corn and DDGS at and DDGS loading facilities, rail cars, cargo containers, and ships; and, (5) upon information and belief, Syngenta's widespread contamination of the U.S. corn and corn seed supply with MIR162 which will continue to result in the reduction of the U.S. corn and DDGS export market to China (and prices) in the future. But for the conduct of Syngenta complained of herein, these losses would not have occurred by the Class.

## II.    PARTIES

12.    Plaintiff Rail Transfer, Inc. ("Plaintiff") is a Minnesota corporation whose principal place of business is located at 800 Grotto Street North, Saint Paul, Minnesota 55104. Plaintiff's President is Todd R. Nimmo.  Plaintiff was founded in 1995, originally loading logs into containers.  Since 2001, Plaintiff started loading bulk whole grains into containers bound for export, becoming the first third-party company to provide such services in the Twin Cities metropolitan area.   In 2012, Plaintiff modernized its loading operations and unveiled a state of the art facility that primarily loads DDGS into cargo containers bound for China. Plaintiff's growth and modernization efforts were recognized at an on-site event on February 16, 2013 that featured the U.S. Secretary of Agriculture,

both of Minnesota's U.S. Senators, and the Minnesota Commissioner of Agriculture.

13.     Because of Syngenta's conduct, described herein, Plaintiff and its customers' DDGS has been and/or is at risk of being contaminated by commingling with MIR162 corn and/or cross-pollination by MIR162 corn, causing physical injury to Plaintiff's property, injury and financial loss.  Plaintiff has been injured by reduced prices for DDGS, resulting in a near-complete loss of business for the services it provides due to Syngenta's conduct described herein.

14.     Defendant Syngenta Corporation is a Delaware corporation with a principle place of business at 3411 Silverside Road #100, Wilmington, Delaware 19810-4812 and may be served through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

15.     Defendant Syngenta Crop Protection, LLC is a limited liability company organized and operating under the laws of the State of Delaware with its principle place of business at 410 South Swing Road, Greensboro, North Carolina 27409-2012. Syngenta Crop Protection, LLC may be served through its registered agent, The Corporation Company, 100 S. 5th Street, Suite 1075, Minneapolis, MN 55402.

16.     Defendant Syngenta Seeds, Inc. is a Delaware corporation with its principle place of business at 11055 Wayzata Boulevard, Minnetonka, Minnesota 55305-1526 and may be served through its registered agent, The Corporation Company, The Corporation Company, 100 S. 5th Street, Suite 1075, Minneapolis, MN 55402.

17.     Upon information and belief the acts of the named Defendants herein were conducted in concert pursuant to an agreement amongst themselves to act in this

collective manner.  All are therefore, jointly and severally liable for the acts complained of herein.

### III.    JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. §§1331 and 1332, 15 U.S.C. §1125(a)(the Lanham Act), and supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).   The amount in controversy exceeds $5 million.

19.    This Court has personal jurisdiction over the Defendants because Defendants regularly and systematically conduct business in this District, including, at minimum, the marketing and sale of VIPTERA and DURACADE corn within this District.  Defendant Syngenta Seeds, Inc., whose activities and conduct is central to this dispute, is headquartered and located in this District.

20.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c) because Defendants have and continue to market, sell, and/or otherwise disseminate VIPTERA and DURACADE corn in this District, and because Defendants are actively doing business in this District.   In addition, Plaintiff maintains its principal place of business in St.  Paul, Minnesota.

21.    Venue is further proper because a substantial part of the property, particularly the farming operations and the farmland that is the subject of and forming the basis of this action, is situated in this District, and a substantial part of the events or omissions giving rise to this action occurred in this District.

## IV.   FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

**A.   The United States Corn Market**

22.   Corn is the most widely-cultivated grain crop in the U.S.  *See generally,* www.epa.gov/agriculture.ag101.cropmajor.html.  The United States is a major player in the world corn trade market, and is the world's largest producer and exporter of corn. Approximately 80 million acres of farmland is devoted to growing corn.

23.   The U.S. exports about 20 percent of its domestic corn production to other countries. In 2012, China served as the third-leading market for the export of U.S. corn, following Japan and Mexico, with 203 million bushels of U.S. corn exported. The U.S. is by far the world's largest exporter of corn, accounting for approximately 68% of global exports.

24.   Corn is grown on more than 400,000 farms in the United States. The upper Midwest region of the U.S. provides an ideal combination of temperature, rainfall, and soil type for the cultivation of corn. The leading corn producing states are Illinois, Iowa, Minnesota, and Nebraska, which together accounted for more than half of the U.S.'s corn production in 2012. These states combined with Indiana, Ohio, Wisconsin, Missouri, Kansas, and South Dakota, account for 77% of the total annual U.S. corn production.

25.   DDGS is a corn by-product.  China imports approximately 34.2% of U.S. DDGS exports.

**B.   China is a Major Source of U.S. Corn and DDGS Exports.**

26.   China is a significant market for U.S. corn and DDGS exports.

27.   In the past, Japan and Canada were considered the major corn import

markets for U.S. corn exports. Accordingly, many biotech-trait commercialization decisions in the U.S. were made based on approval obtained from those two countries.

28.    At least as of 2009 – before VIPTERA was released for commercial sale, China had become a major importer of corn and corn products.

29.    China emerged as the seventh largest importer of United States corn in the 2009-2010 year.

30.    According to the United States Department of Agriculture, China purchased an estimated 5,000,000 tons of U.S. corn in 2012/13, up from 47,000 tons in 2008, making China the third largest export market for U.S. corn. China was on track to meet or exceed these numbers in 2013/14

31.    Until the disruption described within, Chinese imports of U.S corn and DDGS were expected to continue to rise.  For instance, the United States Department of Agriculture (USDA) forecasted China's corn and DDGS imports to increase from 2.7 mmt in 2012 to 22 mmt by 2023, which would account for nearly half the projected growth in world corn trade.  If the U.S. cannot supply this ever growing demand, other corn exporting countries (such as Ukraine) are capable of replacing the United States as the principal corn exporter to China, to the detriment of the Class.  As of December 2013, USDA projected Chinese imports for the 2013/14 marketing year to reach 7 mmt. However, USDA in January 2014 reduced its projection to 5mmt in response to the halt in corn trade between the U.S. and China described herein.  *See* "Lack of Chinese Approval for Import of U.S. Agricultural Products Containing Agrisure VIPTERA™ MIR162: A Case Study on Economic Impacts in Marketing Year 2013/14," dated April

16, 2014 (Exhibit A).

**C.    China Has A Zero Tolerance Policy For Corn With Unapproved Genetic Traits**

32.    China has a "zero tolerance" policy pursuant to which it will reject corn and DDGS deliveries that contain *any* percentage of corn with unapproved genetic traits. China maintains a zero-tolerance policy toward the import of corn containing MIR162. This means that any detection of MIR162 in a shipment to China will result in rejection of that shipment.

33.    Thus, as a result of China's prohibition on the importation of MIR162 corn, even in trace, low-level amounts, and Syngenta's decision to continue marketing MIR162 to a small minority of U.S. corn farmers – the vast majority of U.S. corn and DDGS has been effectively excluded from a significant market for U.S. corn and DDGS, causing significant damage as prices have dropped from the loss of China's export markets.

**D.    Syngenta's Conduct**

34.    In the fall of 2010, Syngenta developed corn products, sold under the Agrisure VIPTERA trademark, that contain a genetically modified trait known as MIR 162, a gene trait that makes corn resistant to a number of common, destructive insect pests.  Corn with the MIR162 trait is marketed as expressing a protein derived from *Bacillus thuringeinsis* (*Bt*) which is toxic to certain lepidopteron insect pests and thus, is more resistant to several above-ground corn pests, corn borer, corn rootworm and multi-pest complex.  Syngenta had invested significant sums over the previous 5 to 7 years in MIR162 product development.

35.    VIPTERA corn has been grown, licensed, marketed, sold, and/or otherwise

disseminated in the United States since 2010.  Prior to the 2011-2012 crop year, VIPTERA corn was only grown in test plots and seed fields. However, Syngenta commercially launched VIPTERA corn seed in the United States for the 2011-2012 growing season when it opened its sales for the 2011 planting season in August of 2010.

36.     Since then Syngenta has delivered VIPTERA products to more than 12,000 growers who produced yields exceeding hundreds of million bushels of VIPTERA corn.

37.     VIPTERA farmer fields can be found in nearly every state, including Minnesota, Iowa, Nebraska, Michigan, Missouri and Illinois.

38.     Despite this, as of the time of filing this Complaint, crops or products containing MIR162 lack approval for import into China, and China refuses to accept corn containing MIR162.

39.     Syngenta had knowledge of China's zero-tolerance policy prior to the commercialization of VIPTERA corn.

40.     Although it lacked approval, Syngenta nevertheless misinformed customers and other stakeholders of that fact and instead led all to believe that approval from China was imminent. For example, during Syngenta's first quarter 2012 earnings conference call, Syngenta CEO Michael Mack stated "[t]here isn't outstanding approval for China, *which we expect to have quite frankly within the matter of a couple days*...we know of no issue with that whatsoever...." Transcript of Syngenta' s First Quarter 2012 Earning Conference Call (emphasis added) (Exhibit B).

41.     Contrary to Syngenta's statements, MIR162 was not approved by China in 2012, approval was not imminent and it remains unapproved as of the date of this filing –

more than 2 ½ years later.

42.     Despite knowledge that MIR162 has never been approved for import into China, and presented significant economic risks, Syngenta took actions which indicate the contrary.   For instance, Syngenta created and distributed forms and documents that imply MIR162 is accepted in China. For instance, Syngenta's Request Form for Biosafety Certificate Issued by the Chinese Ministry of Agriculture states, "Biosafety Certificates for the following transgenic event(s) were issued to Syngenta Seeds AG...by the Ministry of Agriculture (MOA) of the People's Republic of China (PRC)."  Request Form (Exhibit   C).    Syngenta's   request   form   includes   MIR162   among   approved genetically modified traits, even though MIR162 is not approved. The Syngenta form further states: "The requested Biosafety Certificates will be provided to Recipient to assist Recipient in obtaining required authorization for shipments containing the above marked Corn Product(s) into China." *Id.* Syngenta's form is deceptive and deceives members of the Class because MIR162 has never been approved for import into China.

43.     Syngenta omitted material information when marketing its seeds to Plaintiff and other members of the Class that MIR162 has never been approved for import into China, one of the largest importers of corn in the world.  Further, Syngenta downplayed the importance of China as an export source when U.S. corn and DDGS exports to China have gained significantly over the last five marketing years – the entire period MIR162 has been available.  Reasonable persons in the position of Plaintiff and the Class would have wanted to know this important information when determining their course of conduct.  Had such information been disclosed, they would have acted differently.

44.     As another example, Syngenta published a "fact sheet" on its website about VIPTERA called "Plant with Confidence," which is directed at farmers. Syngenta's fact sheet engages in direct misrepresentations about U.S. corn exports. *See* Agrisure VIPTERA "Plant With Confidence" Fact Sheet, available at http://www.syngenta-us.com/viptera_exports/images/Agrisure-Viptera-Fact-Sheet.pdf (Exhibit D).

45.     In order to convince farmers that the loss of key export markets was unimportant, Syngenta's "Plant With Confidence" marketing materials states that "in the last five years, on average, only about 13 percent of U.S. corn has been exported." *Id.* Additionally, Syngenta claims that "the vast majority of corn produced in the U.S. is used domestically." *Id.*

46.     Furthermore, Syngenta's "Plant With Confidence" fact sheet attempts to downplay the importance of China as an export market for U.S. corn. The fact sheet states that China has imported, on average, a little more than half of one percent (0.5%) of all U.S. corn produced in the past five years. Syngenta's fact sheet also states that "traditional major markets are legally able to accept Agrisure VIPTERA grain," which implies that China is not a traditional major market. *Id.*

47.     Syngenta's misrepresentations contradict the statistics reported by the USDA, which state that China serves as the third-largest export market for U.S. corn. Moreover, while historically (prior to 2008) China was not a significant importer of U.S. corn and DDGS, Syngenta knew that by 2010, China was projected to be a top importer of U.S. corn and DDGS.

48.     Further, Syngenta had knowledge that there was no means of detecting a

"zero" level of MIR162 in a given sample. When asked about potential detection methods, Syngenta's North American Head of Corn, Charles Lee, testified: "Yeah, nothing can detect to zero." Deposition of Charles R. Lee, Sept. 7, 2011, *Syngenta Seeds, Inc., v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB, (N.D. Iowa Sept. 15, 2011) ECF No. 32-6, at p. 92:21 (Exhibit E) (hereinafter "Lee Deposition"). In other words, there is always a risk that if a corn shipment is tested in the U.S. and is negative for MIR162, a second test at port could result in a positive for MIR162.

49.    Furthermore, when questioned about the decision-making process to commercialize VIPTERA corn, Mr. Lee stated that commercialization was premised on U.S. deregulation and Japanese and Canadian approval. *Id.* at 83:13-84:7.  Mr. Lee further testified: "we operate on the principle that we need U.S., Japan and Canada. And so once we have those approvals, we do commercialization of the product..."  Lee Deposition at 90:10-13.

50.    Therefore, Syngenta recognized that risks were presented by its conduct rushing a product to market without first receiving approvals from certain other countries to which U.S. corn is exported. Despite this knowledge, it did not wait for Chinese approval.

51.    In November 2013, shipments of corn and DDGS containing MIR162 arrived in China. These shipments were rejected because MIR162 was present and not approved for import into China. Since this initial rejection, China has continued to reject shipments of corn and DDGS due to the MIR162 contamination caused by Syngenta. The widespread nature of MIR162 contamination has injured the 2014 U.S. corn export

market to China, causing billions of dollars of damages to U.S. exporters and related entities, including Plaintiff and members of the Class.

52.     Syngenta knew or should have known of the potential for catastrophic damage when unapproved traits are released prematurely.   As early as August 2011, the National Grain and Feed Association (NGFA) and North American Export Grain Association (NAEGA) advised:

> U.S. farmers, as well as the commercial grain handling and export industry, depend heavily upon biotechnology providers voluntarily exercising corporate responsibility in the timing of product launch as part of their product stewardship obligation. Technology providers must provide for two critical elements: First maintaining access to key export markets like China, or for that matter any market like China that has a functional, predictable biotech-approval process in place; for restricted marketability of their products based upon approval status in major markets. The negative consequences of overly aggressive commercialization of biotech-enhanced events by technology providers are numerous, and include exposing exporting companies to financial losses because of cargo rejection, reducing access to some export markets, and diminishing the United States' reputation as a reliable, often-preferred supplier of grains, oilseeds and grain products. Premature commercialization can reduce significantly U.S. agriculture's contribution to global food security and economic growth.

Putting the Chinese and other markets at risk with such aggressive commercialization of biotech-enhanced events is not in the best interest of U.S. agriculture or the U.S. economy. *See* NGFA and NAEGA Joint Statement on Media Reports of Lawsuit Involving Syngenta's Agrisure VIPTERA™ Corn (MIR162) dated August 26, 2011 (Exhibit F).   Upon information and belief, Syngenta possessed this document and/or the information and the warning contained within it at relevant times.   Despite that, Syngenta ignored such warnings and acted contrary to them.

53.     Syngenta's motivation in prematurely releasing VIPTERA corn was profit driven – that is, placing Syngenta's profits first and ahead of the interests of others, including those of Plaintiff and the Class.

54.     Despite the foregoing, Syngenta continues to cause damage to U.S. corn and DDGS exports to China, although Syngenta either knew or should have known that VIPTERA corn would and now has reduced exports of corn to China. Syngenta knew or should have known of the devastating effect of its release of MIR162 because, as Syngenta states in its Bio Product Launch Policy, created in November 2007, "We will conduct market and trade assessments to identify key import markets for all of our biotech products prior to product commercialization." *See* Bio Product Launch Policy, available at www.syngentabiotech.com/biopolicy.aspx (Exhibit G).  Syngenta failed to adhere to such policies and procedures.

55.     Despite the foregoing, Syngenta continues its reckless conduct by releasing a second version of MIR162 corn, DURACADE, once again without import approval from China. *See* NGFA Estimates up to $2.9 Billion Loss to U.S. Corn, Soy in Aftermath of Trade Disruption with China Over Detection of Unapproved Syngenta Agrisure VIPTERA MIR162 Corn, April 16, 2014 (Exhibit H).

56.     Concerned about another premature release and given the damage Syngenta caused to the corn export market with its premature release of VIPTERA corn, the National Grain and Feed Association ("NGFA") and North American Export Grain Association ("NAEGA") released a joint statement to Syngenta requesting that Syngenta stop the release of DURACADE corn, so that it would stop the cycle of rejection and

damage.  In that statement, the two organizations stated:

> NAEGA and NGFA are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers - as well as the United States' reputation to meet its customers' needs -that has resulted from Syngenta's current approach to stewardship of Viptera. Further, the same concerns now transcend to Syngenta's intended product launch plans for Duracade, which risk repeating and extending the damage. Immediate action is required by Syngenta to halt such damage.

Joint Statement Issued by NGFA and NAEGA Regarding Letter to Syngenta Requesting Suspension of Commercialization Activities of Syngenta's Agrisure VIPTERA™ and DURACADE™ Corn, January 23, 2014 (Exhibit I).

57.    Despite warnings from the NGFA and NAEGA, Syngenta released DURACADE. This second premature release further jeopardized the Chinese import market, as DURACADE contains not only unapproved MIR162, but also other unapproved traits.  Contamination of corn and DDGS with these additional genetically modified ("GM") traits, as set forth more fully below, will continue the rejection of U.S. corn and DDGS shipments to China.

58.    Syngenta, therefore, made the conscious decision in reckless disregard of the consequences from which malice may be inferred that it was more profitable to rush VIPTERA and DURACADE to the market, maximize and extract a huge profit, and recoup its research costs, even though it knew the premature release of the corn products would likely prevent U.S. corn and DDGS from being sold to markets such as China and would cause injury to the Class.

**E.    Effect of Syngenta's Conduct on The United States Corn Export Market**

59.    The premature release of VIPTERA corn by Syngenta has damaged the

U.S. corn and DDGS market (and, in turn, Plaintiff and the Class) in many ways.

60.     Since November of 2013 (i.e., the positive tests for MIR162 in China), Chinese imports for U.S. corn and DDGS have fallen by an estimated 85%.

61.     The NGFA has estimated that the premature release of VIPTERA corn caused corn prices to decline by $0.11 per bushel. *See* Lack of Chinese Approval for Import of U.S. Agricultural Products Containing Agrisure VIPTERA™ MIR162: A Case Study on Economic Impacts in Marketing Year 2013/14, April 16, 2014 (Exhibit A).

62.     According to the National Grain and Feed Association, Syngenta's premature release of VIPTERA corn cost the U.S. corn and DDGS market a minimum of $1 Billion-and up to $3 Billion-due to the rejection of U.S. corn and DDGS exports to China. *See*, Legal Obligations and Potential Market Impacts Associated with Biotech-Enhanced Seeds Producing Grain Not Approved for Import into US. Export Markets, May 1, 2014 (Exhibit J).

63.     On April 16, 2014, the National Grain and Feed Association reported:

> The NGFA's study found that in the aftermath of the disruption in U.S. corn shipments to China that began in November 2013 following detection of MIR162, financial losses to U.S. corn, distillers dried grains with solubles (DDGS) and soybean sectors are estimated to range from $1 billion to $2.9 billion.  U.S trade has come to a standstill since then, and trade with China in DDGS and other U.S. commodities is being conducted in a riskier market environment.

> ...Meanwhile, the NGFA analysis estimates that U.S. corn prices would have been 11 cents per bushel greater if the MIR162-related trade disruption with China had not occurred.  The study found that that applying this price-depressing impact across U.S. corn production amounts to a $1.144 billion loss for U.S. corn farmers over the last nine months of the current 2013/14 marketing year.

NGFA Estimates up to $2.9 Billion Loss to US Corn, Soy in Aftermath of Trade

Disruption with China Over Detection of Unapproved Syngenta Agrisure VIPTERA MIR162 Corn, April 16, 2014 (Exhibit H).

64.   The U.S. corn market, generally, is commodity-based and gathers, commingles, and ships corn from hundreds of thousands of farmers through local, regional, and terminal grain elevators and other corn storage and transportation facilities, which are generally not equipped to test and segregate corn varieties.   To undertake testing and segregation at these facilities causes disruption and expense.

65.   After rejections of U.S. corn and DDGS by China started in late 2013, corn and DDGS prices decreased.   The rejection of U.S. corn and DDGS imports has and continues to negatively impact the global corn and DDGS market. This market shift comes as China was expected to import a record high 7 million tons of U.S. corn according to the U.S. Department of Agriculture. This caused financial injury to Plaintiff and the Class.

66.   Because Plaintiff and the Class members produce or export DDGS, or provide related services to those that do, the price depression caused by Syngenta's actions has caused them damage and injury.

**F.   Syngenta Knew That Disruption To The Chinese Import Market Would Negatively Influence The Global Corn Market.**

67.   Syngenta should have reasonably foreseen that its conduct, described herein, would cause injury to Plaintiff and the Class.

68.   Syngenta knew or should have known that disruption to the Chinese import market would negatively influence the global corn market and injure the Class.

69.   In Syngenta's 2010 Full Year Results, CEO Michael Mack ("Mr. Mack")

stated that Chinese "import requirements alone influence global commodity prices." Transcript of 2010 Full Year Results Conference Call, February 9, 2011 (Exhibit K).

70.     During Syngenta's 2011 Half Year Earnings Report, Mr. Mack again commented on the importance of the Chinese market, stating that China "continues to have the greatest impact on world markets, with increasing imports not just of soybeans but also now of corn."  Transcript of 2011 Half Year Earnings Conference Call, July 22, 2011 (Exhibit L).

71.     In response to a question during the first quarter 2012 earnings conference call regarding the status of Chinese approval of VIPTERA, Mr. Mack stated "[t]here isn't outstanding approval for China, which we expect to have quite frankly within the matter of a couple days...we know of no issue with that whatsoever...." Transcript of Syngenta's First Quarter 2012 Earning Conference Call (Exhibit B).

72.     Mr. Mack had an economic motivation for making this statement-continued sales of VIPTERA corn.

73.     Mr. Mack's statement was disseminated sufficiently to constitute promotion within the grain industry.

74.     This statement, and others like this, dangerously impacted the corn market by, for example, encouraging (1) farmers to plant MIR162; (2) grain elevators to accept and commingle MIR162 with other grains; and, (3) exporters to purchase and ship products containing MIR162.

75.     In 2014, Syngenta knew or should have known that China would not approve MIR162 in time for 2014 planting. For example, Mr. Mack stated during

Syngenta's first quarter 2014 conference call "I think it is fair to say at this point in time that we don't have- that we will not have any approval before the start of the season. That's for sure."  First Quarter 2014 Sales Transcript (Exhibit M).

76.    In a question about whether Syngenta would insure farmers from losses caused by VIPTERA rejection in China during a 2014 first quarter conference call, Mr. Mack replied: "[F]armers don't have any exposure whatsoever to Chinese corn rejection. When they sell their corn into an elevator, the elevator then sells it on to a grain trader where, if and where there is any financial exposure from a rejection, that's between the two parties, the importer and the exporter of corn. The farmers don't involve themselves in that. So with respect to indemnifying a farmer, backstopping their losses, there's no need for Syngenta to do that because the farmer doesn't have any exposure to that." *Id.* To the contrary, losses to U.S. corn farmers as a result of Syngenta's activities have been staggering.

77.    During Syngenta's second quarter 2014 most recent earnings conference call Mr. Mack made the following statements regarding Chinese approval of VIPTERA corn:

> You ask about Viptera and our regulatory issues. Actually, I think this is a regulatory matter in China as opposed to any regulatory matter with Syngenta. The delays coming out of China are such that people just aren't really understanding right now even what the process is.
>
> We don't have it in hand and I wouldn't want to say any more about when we might have it in hand, beyond to say that there is no question; there is no technical question right now waiting from the Chinese about it, and it's been approved already in virtually every other market. So, we'll see what happens over the coming weeks, months, quarters.

Syngenta's (SYT) CEO Michael Mack on Q2 2014 Results – Earning Call Transcript

(Exhibit N).

78.     Thus, Syngenta recognized that there is an ongoing problem with exports to China due to its MIR162 products. Yet Syngenta continues to sell MIR162 products. In doing so Syngenta knows or should know that its conduct causes injury to the class.

**G.     Syngenta's Conduct is Profit-Driven.**

79.     VIPTERA corn was developed by Syngenta using modern biotechnology techniques. Syngenta modified the corn by inserting genetic material from a bacterium, altering the corn to produce certain proteins. These proteins have insecticidal properties which provide insecticidal protection.

80.     Syngenta invested approximately $200 million and five to seven years developing VIPTERA corn. *See* Lee Deposition at p. 71.

81.     As a bio-engineered product, VIPTERA corn was subject to U.S. and foreign regulatory approval prior to cultivation and import.

82.     Syngenta had registered VIPTERA corn as a pesticide with the Environmental Protection Agency.

83.     VIPTERA was deregulated by the U.S. Department of Agriculture in April 2010.

84.     In 2010, however, Syngenta made the decision to release VIPTERA corn commercially for the 2011/12 growing season. But this release came at a time when VIPTERA corn still lacked approval by import markets such as China, Japan, and the European Union.   While Japan and the European Union have since approved the importation of VIPTERA corn, China has never done do.

85.     Despite this, Syngenta encouraged and still encourages farmers to grow VIPTERA corn.   This conduct was reckless and done with a profit motive.

86.     Upon information and belief, VIPTERA corn is presently approximately 25% of Syngenta's corn portfolio. In 2013, Syngenta's corn sales were over $3.5 billion. *See* Syngenta's Annual Report, Form 20-F at p. 13, filed with the Securities and Exchange Commission on February 13, 2014 (Exhibit O).

87.     There was no requirement that Syngenta commercialize VIPTERA corn prior to receiving Chinese import approval. However, as stated by Syngenta's Head of Corn, Mr. Lee, Syngenta was "trying to recoup [its] costs as an organization." Further, Syngenta "[l]ike anybody, [wanted] to derive some income from [its] products." Lee Deposition at 70:22-71:18.

88.     Because VIPTERA corn is protected by Syngenta patent(s), Syngenta has the right to exclude others from selling products with the VIPTERA corn traits for a limited time period. The limited time period during which Syngenta possessed such marketing exclusivity motivated Syngenta to push VIPTERA to market prior to it having approval from China regardless of the harm such decisions inflicted on the Class.   As Syngenta's Head of Corn, Mr. Lee, testified: "[y]ou have to operate in the nongeneric period [of Syngenta's patent covering VIPTERA corn]. You like to optimize that period." Lee Deposition at 72:3-6.

## H.     Contamination of the United States Corn Supply

89.     Commingling different varieties of corn is always a risk during planting, harvesting, drying, storage, and transportation of corn. Thus, once released, a corn variety

will, without adequate protections, contaminate the broader corn supply.

90.     Despite contamination risks, as part of its commercial launch of VIPTERA corn, Syngenta offered farmers a "side-by-side program," which encouraged farmers to plant VIPTERA corn seed side-by-side with other corn seed.

91.     Rather than instruct its customers on how to limit the contamination of VIPTERA corn into the broader corn supply, Syngenta's side-by-side program encouraged farmers to not take precautions. By doing this, Syngenta helped spread the amount of MIR162 that would appear in the U.S. corn supply, thus further putting at risk corn and DDGS destined for export to China.

92.     Syngenta knew or should have known that encouragement of side-by-side planting of VIPTERA and non-VIPTERA corn would inevitably lead to commingling.

93.     Syngenta knew or should have known that this commingling would result in rejected shipments of U.S. corn and DDGS by Chinese regulatory officials.

94.     In short, Syngenta knew or should have known of the high risk and consequences of commingling VIPTERA corn with the broader corn supply. Syngenta encouraged farmers to disregard practices designed to prevent commingling and encouraged side-by-side planting of VIPTERA and non-VIPTERA corn, raising the probability of contamination by commingling.

95.     Corn replicates by cross-pollination from one plant to another. Pollen from corn has been shown to "drift" over considerable distances and cross-breed with corn from other plants.

96.     The corn resulting from cross-pollination can express traits from pollen-

donating plant.

97.     Those knowledgeable in the field suggest that, at a minimum, pollen can travel 200 feet. Some studies have found that cross-pollination cannot be eliminated, even at a distance of one third of a mile. *See* Peter Thomison, Managing "Pollen Drift" to Minimize Contamination of Non-GMO Corn, The Ohio State University Extension Fact Sheet, available at http://ohioline.osu.edu/agf-fact/0153.html (Exhibit P).

98.     Without adequate precautions, neighboring corn fields will exchange pollen.

99.     The Thomison article, attached as Exhibit P, states, "[e]ach corn plant is capable of producing 4 to 5 million pollen grains." *Id*.  Further, the Thomison article states "even if only a small percentage of the total pollen shed by a field of corn drifts into a neighboring field, there is considerable potential for contamination through cross pollination." *Id.*

100.    Syngenta, as a leader in the field of corn biotechnology, understood or should have understood the effects and risks of contamination by cross-pollination at the time of the release of VIPTERA corn.

101.    Syngenta recognized in its "Agrisure® Traits Stewardship Guide" that "[a] normal occurrence in corn production is cross-pollination..." and "[i]t is not possible to achieve 100% purity of seed or grain in any corn production system and a certain amount of adventitious pollen movement will occur." Syngenta Agrisure® Traits Stewardship Guide (Exhibit Q).

102.    Other seed producers agree. DuPont Pioneer published a fact sheet stating

"Remember that achieving 100% purity is virtually impossible in seed or grain production." DuPont Pioneer, Maximizing Genetic Purity of corn in the Field, available at  https://www.pioneer.com/CMRoot/Pioneer/US/products/stewardship/geneticpurity.pdf (Exhibit R).

103.   Upon information and belief, Syngenta encouraged cross-pollinating of VIPTERA corn with non-VIPTERA corn and its "side-by-side program" because it knew that cross-pollination was certain to occur. Unfortunately, this led to additional contamination of the U.S. corn supply with the MIR162 trait.

104.   In short, Syngenta knew that pollen drift was certain to occur and encouraged farmers to plant VIPTERA corn in a way that promoted cross-pollination and thus contamination of the U.S. corn supply.

## I.   The Syngenta v. Bunge North America, Inc. Litigation

105.   Syngenta has taken other actions to pressure industry participants to use MIR162 and disregard the significant risks presented.  In August 2011, Syngenta Seeds, Inc., went so far as to commence a lawsuit against a grain elevator and handling company for refusing to accept MIR162 due to the risks presented to U.S corn producers and farmers by China's non-approval. Such conduct is demonstrative of Syngenta's knowledge and reckless conduct in disregard for the rights and well-being of the Class, complained of and described in greater detail herein.

106.   In August 2011, Syngenta Seeds, Inc., filed suit against Bunge North America, Inc. ("Bunge"), a grain elevator and handler based in St. Louis, Missouri.  The suit arose after the 2011 planting season, but before the 2011 harvest season, when Bunge

posted signs and distributed materials stating that VIPTERA corn would not be accepted because it had not been accepted for import into China and therefore, presented significant risks to participants in the market (such as the Class here).

107.   Bunge cited the lack of Chinese import approval as its reason for not accepting VIPTERA corn but noted that it would be accepted "once the seeds receive approval from major export markets."

108.   In response, Syngenta sued Bunge in the United States District Court for the Northern District of Iowa, seeking, *inter alia*, preliminary and permanent injunctions requiring Bunge to stop posting materials regarding its refusal to accept VIPTERA corn and requiring Bunge to accept VIPTERA corn at its facilities. Complaint, *Syngenta Seeds, Inc., v. Bunge North America, Inc.*, No. 11-cv-04074-MWB, (N.D. Iowa Aug. 22, 2011) ECF No. 1.

109.   Bunge responded to the lawsuit stating:

August 23, 2011 - St. Louis, Missouri - Bunge North America, the North American operating arm of Bunge Limited (NYSE: BG), issued the following statement which can be attributed to Soren Schroder, Bunge North America president and CEO.

Bunge North America is aware from press reports of Syngenta's allegations. From what we know and from prior conversations with Syngenta, we are surprised and disappointed that Syngenta has taken an action which could put at risk a major export market for U.S. corn producers in China.

Bunge is a strong proponent of agricultural biotechnology and the benefits it offers to the entire value chain. We have communicated to Syngenta on several occasions that Bunge looks forward to accepting Agrisure Viptera once approval from China is secured. We understand that Syngenta expects this will happen in early 2012.

***However, until this approval occurs, we must protect the integrity of our***

27

*export supply chain by not accepting Agrisure Viptera and other varieties that do not have major export market approval. Our obligation to our farmer customers is to provide access to the global marketplace and the price benefits of that access. Syngenta's decision to commercialize Agrisure Viptera should not foreclose our ability to sell to a major market in China.*

Bunge's decision not to accept Agrisure Viptera is consistent with the North American Export Grain Association's (NAEGA) policy to advocate that technology providers receive all major international approvals for a trait prior to seed sales. The grain export industry, which includes Bunge, notified Syngenta more than a year ago that China is considered a major export market.

According to the U.S. Department of Agriculture, China is currently the seventh largest destination for U.S. corn with imports expected to grow significantly this year.

Statement of Soren Schroder, President and CEO of Bunge North America, available at

https://www.bungenorthamerica.com/news/28-bunge-responds-to-syngenta-suit

(emphasis added) (Exhibit S).

110.   The court ultimately denied Syngenta's request for a preliminary injunction. Memorandum Opinion and Order: Denying Motion for Preliminary Injunction, *Syngenta Seeds, Inc., v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB, (N.D. Iowa Sept. 26, 2011) ECF No. 42.

## V.   CLASS ACTION ALLEGATIONS

111.   Pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure Plaintiff brings this action on behalf of himself and as the "Class" defined as:

**Nationwide Class**
All persons and entities in the United States, who since January 1, 2013 prepared, exported or sold corn or DDGS on a commercial basis.

**Minnesota Subclass**
All persons and entities in Minnesota, who since January 1, 2013 prepared, exported or sold corn or DDGS on a commercial basis.

Specifically excluded from the Class and Subclass are: (a) any officers, directors or employees of Defendants; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court; and (d) any juror selected to hear this case. The Class and Subclass are collectively referred to herein as the "Class" unless otherwise indicated.

112. All requirements for class certification in Fed. R. Civ. P. 23(a), and 23(b)(3) are satisfied with respect to the Class. Alternatively, class certification under Fed. R. Civ. P. 23(b)(1), 23(b)(2), or both, is proper.

113. ***Numerosity of the Class***. Members of the Class are so numerous that their individual joinder is impracticable. The precise number of members of the Class and their addresses are presently unknown to Plaintiff. Plaintiff is informed and believes that there are hundreds of putative class members nationwide, and certainly more than 40. Therefore, the "numerosity" requirement of Rule 23(a)(1) is met.

114. ***Ascertainable Class.*** The community of interest among these class members in the litigation is well defined and the proposed class is ascertainable from objective criteria. If necessary to preserve the case as a class action, the court itself can redefine the Class, create sub-classes, or both.

115. ***Common Questions of Fact and Law Exist and Predominate over Individual Issues.*** There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. These common questions of law

and fact exist as to all members of the Class and predominate over the questions affecting only individual members of the Class.  Defendants have engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Similar or identical statutory and common law violations, business practices, and injuries are involved as to all members in the Class and each State Sub-Class. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.  These common legal and factual questions include without limitation:

    a.    whether Syngenta through its conduct, acts and omissions caused or allowed MIR 162 to contaminate and commingle the U.S. corn and corn seed supply;

    b.    whether Defendants caused or allowed MIR162 to contaminate the U.S. corn and corn seed supplies;

    c.    whether Defendants caused or allowed MIR162 to contaminate the U.S. corn and DDGS supply;

    d.    whether U.S. corn and DDGS prices have dropped due to Defendants' conduct;

    e.    whether Plaintiff and the members of the proposed class have sustained or continue to sustain damages as a result of Syngenta's wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining damages for the injuries sustained;

    f.    the proper measure of damages; and,

    g.    whether Plaintiff and other class members are entitled to injunctive, declaratory or other equitable relief.

116. ***Typicality.***  Plaintiff is a member of and presents claims that are typical of the claims of members of the Class.   Plaintiffs' business involves preparing and

transporting DDGS for export to China.  Plaintiff's claims are typical because the claims arise from the same course of conduct by Syngenta and are based upon the same legal theories.  Plaintiff and all Class members each sustained damages arising from Defendants' wrongful conduct, as alleged more fully herein.  All members of the Class have been the subject of Defendants' unfair and unlawful business practices as described herein.  The relief sought is common, unitary, and class-wide in nature.  Class members have lost income and sustained other economic loss as a result of the loss of the China market and depression of prices.  The same material facts that Defendants withheld from Plaintiff were withheld from the other members of the Class.  The test for materiality is an objective test subject to class wide proof.

117.   Adequacy of Representation.  Plaintiff will fairly and adequately represent and protect the interest of the members of the Class.  Plaintiff shares a common interest with all Plaintiff class members, with respect to the conduct of Defendants herein, and redress of same.  Plaintiff has suffered an injury-in-fact as a result of the conduct of Defendants, as alleged herein.  Plaintiff has retained counsel who are competent and experienced in the prosecution of complex litigation and class actions.  Plaintiff and its undersigned counsel intend to prosecute this action vigorously and faithfully for the benefit of the Class.  Plaintiff has no interests contrary to the class members, and will fairly and adequately protect the interests of the Class.  Plaintiff's counsel, identified below, satisfy the requirements of Fed. R. Civ. P. 23(g) to serve as class counsel.  Plaintiff satisfies the adequacy of representation requirement in Fed. R. Civ. P. 23(a)(4).

118.   ***Predominance / Community of Interest***.  The proposed Class has a well-

defined community of interest in the questions of fact and law to be litigated.  The common questions of law and fact predominate with respect to the liability issues, relief issues and anticipated affirmative defenses. The named Plaintiff has claims typical of the Class.  Without limitation, as a result of Defendants' conduct alleged herein, Plaintiff was: (a) injured; and (b); sustained pecuniary loss in an ascertainable amount to be proven at the time of trial.

119.    Superiority of Class Adjudication.  The certification of a class in this action is superior to the litigation of a multitude of cases by members of the putative class. Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are class members who are unlikely to join or bring an action due to, among other reasons, their reluctance to sue Defendants or their inability to afford a separate action. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of the litigation among the class members in relationship to the benefits received.  Even if the members of the classes themselves could afford individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

120.    In the alternative, the above-defined Class may be certified pursuant to Fed.

R. Civ. P. 23(b)(1) and (b)(2) because:

a. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual class members' claims which would establish incompatible standards of conduct for Defendant;

b. The prosecution of separate actions by individual members of the classes would create a risk of adjudications which would as a practical matter be dispositive of the interests of other members of the classes who are not parties to the adjudications, or which would substantially impair or impede the ability of other class members to protect their interests; and,

c. Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final and injunctive relief with respect to the Class.

## VI.   <u>CAUSES OF ACTION</u>

### COUNT I
### VIOLATION OF LANHAM ACT - 15 U.S.C. §1125(a)(l)(B)

121.   Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

122.   The Lanham Act, 15 U.S.C. §1125(a), provides in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

123.   Syngenta used and continues to use in commerce false or misleading descriptions of fact or false or misleading representation of fact, which were likely to

cause confusion or mistake.

124.    Syngenta's statements and commentary made to the press, statements on the Internet, during quarterly conference calls, and incorporated into Syngenta's forms, which, inter alia, represent VIPTERA corn is or would imminently be approved for import into China, as alleged above, are materially false or misleading statements that are and continue to be likely to cause confusion and mistake as to the nature, characteristics, and qualities of VIPTERA corn.

125.    Syngenta's misleading representations of fact relating to the U.S. corn and DDGS export market, and particularly in relation to China's position as a major export market, also deceived and continue to deceive farmers and other consumers. Syngenta's "Plant With Confidence" fact sheet has, and is likely to continue, to cause confusion and mistake as to the percentage of U.S. corn and DDGS exported to China on an annual basis, among other facts.

126.    Additionally, Syngenta's representations deceived and continue to deceive farmers and other consumers as to the approval of their goods (namely VIPTERA and DURACADE corn).

127.    Syngenta's VIPTERA and DURACADE corn products caused customer confusion regarding the approval of the products from foreign regulatory authorities, including the Chinese government.

128.    Yet, Syngenta has used and continues to use false representations regarding the approval of VIPTERA and DURACADE corn to capture business, increase sales, and enhance products.

129.   Syngenta's statements were made as an advertisement for VIPTERA corn.

130.   Syngenta's statements refer specifically to VIPTERA corn.

131.   Syngenta had an economic motivation for making its statements - sales of VIPTERA corn.

132.   Syngenta's statements were likely to influence purchasing decisions.

133.   Syngenta's statements where widely distributed, which is, at least, sufficient to constitute promotion within the grain industry.

134.   Upon information and belief, consumers of Syngenta were actually confused by Syngenta's misleading representations and omissions.

135.   Plaintiff's commercial interests are within the zone of interests intended to be protected under the Lanham Act, and therefore has and continues to be damaged by Syngenta's conduct.

136.   Plaintiff's damages were proximately caused by Syngenta's acts.

137.   Syngenta has indicated Chinese approval was imminent, when in fact it was not, and Syngenta's "Certificate for Biosafety Certificate(s) Issued By The Chinese Ministry of Agriculture" falsely represents that VIPTERA corn was approved for import into China. *See* Exhibit C.

138.   Syngenta's acts constitute the use of false descriptions and false representations in interstate commerce in violation of the§ 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

139.   As a direct and proximate result of the foregoing, Plaintiff and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory

and other relief as may be available at law or equity is warranted.

## COUNT II
## PUBLIC NUISANCE

140.   Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

141.   Through the conduct alleged above, Syngenta has created a public nuisance by causing widespread contamination of the U.S. corn and DDGS supply with the MIR162 trait.

142.   This unreasonable interference is imposed on the community at large and on a considerable diverse number of persons and entities. It arises from Syngenta's testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn: (a) without adequate precautions to prevent contamination of the U.S. corn and DDGS supply; (b) with the knowledge that VIPTERA corn would contaminate other corn and DDGS; (c) with the knowledge that this contamination would likely affect the U.S. corn and DDGS supply; or, (d) with the knowledge that there was a substantial risk of contamination of corn and DDGS supply  earmarked for export to major trade partners like China.

143.   Syngenta has unreasonably interfered with the public's right to expect compliance with the federal laws governing the testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn. Syngenta has further unreasonably interfered with the public's right to expect that the corn and DDGS sold to the general public is free from contamination with VIPTERA corn as well as the public's right to be notified of whether the corn sold to the public is contaminated with

genetically-modified organisms - including corn and DDGS containing MIR162 - so that the public has the freedom to choose to purchase and consume non-contaminated corn and DDGS.

144.   This interference is unreasonable in that it involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience. It is also unreasonable in that it is proscribed by law, is of a continuing nature, and has produced a permanent or long-lasting effect.

145.   Plaintiff has suffered harm caused by Syngenta's public nuisance distinct from and different than that suffered by the general public, as described above.Plaintiff and the Class's damages include, but are not limited to, the elimination of their ability to sell their DDGS for export to the Chinese market; depressed prices for the sale of their DDGS; commingling of MIR162-corn in DDGS at ethanol plants, loading facilities, rail cars, cargo containers and ships; almost-certain contamination of the MIR162 genetic trait with their DDGS as a result of cross-pollination from nearby fields; and increased cleaning costs of their DDGS-related equipment in an attempt to reduce MIR162 contamination.

146.   This constitutes an unreasonable and substantial interference with rights common to the general public, restricted demand for their products and services in certain markets; and reduced prices for their corn in all markets.

147.   In light of the surrounding circumstances, Syngenta knew or should have known that their conduct would naturally or probably result in injuries and damages to Plaintiff. Nevertheless, Syngenta continued such conduct in reckless disregard of or

conscious indifference to those consequences.

148.   As a direct and proximate result of the foregoing, Plaintiff and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

## COUNT III
## TRESPASS TO CHATTELS

149.   Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

150.   Plaintiff and those similarly situated commonly enter into contracts for the purchase of corn and DDGS well in advance of delivery.

151.   Syngenta, by testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn has contaminated the U.S. corn and DDGS supply as described above.  Syngenta knew that releasing MIR162 prior to approval by China would contaminate the corn supply to Plaintiff's and class members' detriment.

152.   MIR162 contamination has negatively impaired the condition, quality, or value of the U.S. corn and DDGS supply.

153.   Plaintiff, as a direct and proximate result of the fault of Syngenta, has been damaged in amounts not fully determined but far in excess of any jurisdictional requirements of this court for diversity jurisdiction.

154.   Plaintiff has suffered harm caused by Syngenta's public nuisance distinct from and different than that suffered by the general public, as described above., Plaintiff and the Class's damages include, but are not limited to, the elimination of their ability to sell their DDGS for export to the Chinese market; depressed prices for the sale of their

DDGS; commingling of MIR162-corn in DDGS at ethanol plants, loading facilities, rail cars, cargo containers and ships; almost-certain contamination of the MIR162 genetic trait with their DDGS as a result of cross-pollination from nearby fields; and increased cleaning costs of their DDGS-related equipment in an attempt to reduce MIR162 contamination.

155.   Syngenta's actions, including the testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn, which led to the market-wide contamination have harmed Plaintiff's  economic interests.

156.   As a direct and proximate result of the foregoing, Plaintiff and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

**COUNT IV**
**COMMON LAW NEGLIGENCE**

157.   Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

158.   With respect to its testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn, Syngenta had a duty to utilize its professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Syngenta's business.

159.   Syngenta breached this duty by failing to exercise the requisite degree of care in testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn to prevent it from contaminating the U.S. corn and DDGS supply.

160.    Upon information and belief, Syngenta further breached their duty by failing to notify the appropriate regulatory bodies and the public in a timely fashion after it first learned of the contamination of the U.S. corn  and DDGS supply with MIR162.

161.    The damages incurred by Plaintiff were or should have been foreseen by Syngenta as Syngenta understood the risks of releasing VIPTERA corn.

162.    Plaintiff has suffered harm caused by Syngenta's conduct. Plaintiff and the Class's damages include, but are not limited to, the elimination of their ability to sell their DDGS for export to the Chinese market; depressed prices for the sale of their DDGS; commingling of MIR162-corn in DDGS at ethanol plants, loading facilities, rail cars, cargo containers and ships; almost-certain contamination of the MIR162 genetic trait with their DDGS as a result of cross-pollination from nearby fields; and increased cleaning costs of their DDGS-related equipment in an attempt to reduce MIR162 contamination.

163.    Syngenta breached its duties, as alleged above, breached the requisite standard of care owed to Plaintiff and those similarly situated, and was therefore negligent.

164.    Syngenta's breaches are a direct and proximate cause of the injuries and damages sustained by Plaintiff in amounts not yet fully determined but far in excess of any amounts necessary for diversity jurisdiction.

165.    As a direct and proximate result of the foregoing, Plaintiff and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

## COUNT V
## STRICT LIABILITY-PRODUCTS LIABILITY

166.    Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

167.    Syngenta was and continues to be a supplier of VIPTERA corn.

168.    Syngenta has in the past and continues to manufacture, sell, or otherwise distribute VIPTERA corn.

169.    VIPTERA corn was used in a manner reasonably anticipated.

170.    As a direct and proximate result of the defective and unreasonably dangerous condition of VIPTERA corn as it existed when Syngenta supplied it, Plaintiff has sustained injuries and damages as alleged above.

171.    In light of the surrounding circumstances, Syngenta knew or should have known that their conduct would naturally or probably result in injuries and damages to Plaintiff, yet continued such conduct in reckless disregard for the consequences.

172.    Plaintiff has suffered harm caused by Syngenta's conduct. Plaintiff and the Class's damages include, but are not limited to, the elimination of their ability to sell their DDGS for export to the Chinese market; depressed prices for the sale of their DDGS; commingling of MIR162-corn in DDGS at ethanol plants, loading facilities, rail cars, cargo containers and ships; almost-certain contamination of the MIR162 genetic trait with their DDGS as a result of cross-pollination from nearby fields; and increased cleaning costs of their DDGS-related equipment in an attempt to reduce MIR162 contamination.

173.    Syngenta's VIPTERA corn is the direct and proximate cause of the injuries

41

and damages sustained by Plaintiff.

174.   As a direct and proximate result of the foregoing, Plaintiff and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

## COUNT VI
## STRICT LIABILITY- FAILURE TO WARN

175.   Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

176.   Syngenta is strictly liable to Plaintiff resulting from its failure to warn about the dangers of planting, growing, harvesting, transporting, exporting or otherwise utilizing VIPTERA corn and DDGS.

177.   Syngenta sold VIPTERA corn in the course of its business, as alleged above.

178.   When planted, grown, harvested, transported or otherwise utilized as reasonably anticipated and without knowledge of its characteristics, VIPTERA corn and DDGS was unreasonably dangerous at the time of its sale.

179.   Syngenta did not give an adequate warning of the danger of planting, growing, harvesting, transporting, or otherwise utilizing VIPTERA corn.

180.   Upon information and belief, VIPTERA corn was used in a reasonably anticipated manner.

181.   Plaintiff suffered injury and damages as a direct and proximate result of Syngenta's failure to provide an adequate warning regarding the dangers of planting, growing, harvesting, transporting, or otherwise utilizing VIPTERA corn at the time

VIPTERA corn was sold.

182.   Plaintiff has suffered harm caused by Syngenta's conduct. Plaintiff and the Class's damages include, but are not limited to, the elimination of their ability to sell their DDGS for export to the Chinese market; depressed prices for the sale of their DDGS; commingling of MIR162-corn in DDGS at ethanol plants, loading facilities, rail cars, cargo containers and ships; almost-certain contamination of the MIR162 genetic trait with their DDGS as a result of cross-pollination from nearby fields; and increased cleaning costs of their DDGS-related equipment in an attempt to reduce MIR162 contamination.

183.   In light of the surrounding circumstances, Syngenta knew or should have known that their conduct would naturally or probably result in injuries to Plaintiff and class members.

184.   Nevertheless, Syngenta continued such conduct in reckless disregard of or conscious indifference to those consequences.

185.   As a direct and proximate result of the foregoing, Plaintiff and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

### COUNT VII
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

186.   Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

187.   Plaintiff had a business relationship with various DDGS exporters and importers, whereas Plaintiff provided services to essential in exporting DDGS to Chinese

importers. This business relationship was memorialized by invoices, receipts, and other documents showing a consistent course of sales.

188.    Plaintiff had a reasonable expectation of economic gain resulting from the relationship with these grain elevators and supply companies, and Plaintiff reasonably expected to continue to sell corn from his farm to such companies. Thus, Plaintiff rightfully maintained the expectation that such business relationships would continue in the future.

189.    Syngenta knew that Plaintiff and others in the Class had business relationships with customers, and Syngenta was fully aware that Plaintiff and others like it expected these business relationships to continue in the future.

190.    Despite this knowledge, Syngenta made representations that deceived and continue to deceive Plaintiff and the Class as to whether Chinese authorities would accept imports containing even traces of VIPTERA and DURACADE corn. These misrepresentations, which included a "Plant With Confidence" fact sheet on Syngenta's website and other various forms, stated that VIPTERA corn is or would imminently be approved for import into China. As a result of these representations, Plaintiff and other Class members reasonably believed that VIPTERA and DURACADE was commonplace and that their ability to sell and export U.S. corn and DDGS would not be impacted.

191.    Syngenta interfered with these prospective future business relationships through its conscious decision to bring VIPTERA and DURACADE corn to the market. Syngenta knew, or should have known, that the releasing MIR162 corn would lead to the contamination of all U.S. corn and DDGS shipments and prevent U.S. corn and DDGS

from being sold to export markets such as China, which has not granted import approval.

192.   Syngenta's release of MIR162 corn has destroyed the export of U.S. corn and DDGS to China and caused depressed prices for all domestic corn producers.  Thus, Plaintiff and other Class Members are unable to sell DDGS to Chinese importers at all but for Syngenta's conduct.

193.   Syngenta intentionally interfered with Plaintiff's prospective business relationships; and Syngenta knew the interference was certain or substantially certain to occur as a result of its conduct in releasing MIR162 corn into the U.S. market.

194.   Plaintiff has been proximately damaged and continues to be damaged as a result of Syngenta's interference.

195.   Plaintiff has suffered harm caused by Syngenta's conduct. Plaintiff and the Class's damages include, but are not limited to, the elimination of their ability to sell their DDGS for export to the Chinese market; depressed prices for the sale of their DDGS; commingling of MIR162-corn in DDGS at ethanol plants, loading facilities, rail cars, cargo containers and ships; almost-certain contamination of the MIR162 genetic trait with their DDGS as a result of cross-pollination from nearby fields; and increased cleaning costs of their DDGS-related equipment in an attempt to reduce MIR162 contamination.

196.   As a direct and proximate result of the foregoing, Plaintiff and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, prays and respectfully requests recovery from the Defendants, jointly and severally, compensatory damages, together with appropriate equitable relief, as follows:

A.   Entry of preliminary and permanent injunctions providing that Syngenta shall be enjoined from selling, marketing, distributing, or otherwise disseminating VIPTERA corn and DURACADE corn, in addition to any other product featuring MIR162 until such time as MIR162 has been approved for import to China;

B.   Entry of judgment ordering Syngenta to take affirmative steps to remediate the contamination that it has already caused;

C.   Entry of judgment finding:

i.   Syngenta falsely advertised VIPTERA corn under § 43(a) of the Lanham Act, 15 U.S.C. §1125(a);

ii.   Syngenta's release of VIPTERA corn constitutes a public nuisance;

iii.   Syngenta's release of VIPTERA corn and contamination of the U.S. corn supply constitutes a trespass to chattels;

iv.   Syngenta's release of VIPTERA corn was negligent;

v.   Syngenta is strictly liable for damages done by the release of VIPTERA corn;

vi.   Syngenta tortuously interfered with Plaintiff's prospective business relations by releasing MIR162 corn into the U.S. market;

D.   Monetary damages including compensatory relief to which Plaintiff and the Class are entitled and will be entitled at the time of trial, but in an amount exceeding $75,000;

E.    Prejudgment interest;

F.    The costs of this action;

G.    Reasonable attorneys' fees and expenses; and,

H.    All such other and further relief as may be available at law or equity and

may be proper in the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

ZIMMERMAN REED, PLLP

Dated:  October 24, 2014

/s/ *Hart L. Robinovitch*
Hart L. Robinovitch, MN Bar No. 240515
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ  85254
(480) 348-6400 Telephone
E-mail: Hart.Robinovitch@zimmreed.com

David M. Cialkowski, MN Bar No. 306526
ZIMMERMAN REED, PLLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 341-0400 Telephone
E-mail: David.Cialkowski@zimmreed.com

Caleb LH Marker, CA Bar No. 269721
(Pending Admission *Pro Hac Vice*)
RIDOUT LYON + OTTOSON, LLP
555 E. Ocean Boulevard, Suite 500
Long Beach, CA 90802
(562) 216-7380 Telephone
E-mail: c.marker@rlollp.com

*Attorneys for Plaintiff*

47